**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ANITA ANNE HARRIS,

　　　　　　　　　　　　　　　CASE NO. 15-cv-13706

　　　　*Plaintiff*,　　　　　　　DISTRICT JUDGE MATTHEW F. LEITMAN
*v.*　　　　　　　　　　　　　MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

　　　　*Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 21, 24)

### I.　　RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Harris is not disabled. Accordingly, **IT IS RECOMMENDED** that Harris's Motion for Summary Judgment, (Doc. 21), be **DENIED**, the Commissioner's Motion, (Doc. 24), be **GRANTED**, and that this case be **AFFIRMED**.

### II.　　REPORT

#### A.　　Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Anita Anne Harris's ("Harris") claim for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C.

1

§ 401 *et seq.* (Doc. 3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 21, 24).

On June 7, 2012, Harris filed an application for DIB, alleging a disability onset date of August 15, 2011. (Tr. 149-50). The Commissioner denied her claim. (Tr. 73-87). Harris then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on August 8, 2013, before ALJ Kevin J. Detherage. (Tr. 40-72). At the hearing, Harris— represented by her attorney, Gregory Bringard—testified, alongside Vocational Expert ("VE") Kelly Stroker. (*Id.*). The ALJ's written decision, issued September 26, 2013, found Harris not disabled. (Tr. 20-35). On August 20, 2015, the Appeals Council denied review, (Tr. 1-4), and Harris filed for judicial review of that final decision on October 20, 2015. (Doc. 1).

### B.      Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

2

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.        Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R.

404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.     ALJ Findings

Following the five-step sequential analysis, the ALJ found Harris not disabled under the Act. (Tr. 20-35). At Step One, the ALJ found that Harris had not engaged in substantial gainful activity from her alleged onset date of August 15, 2011, through her date last insured ("DLI") of March 31, 2014. (Tr. 22). At Step Two, the ALJ concluded that the following impairments qualified as severe: "back pain, obesity, depression, anxiety disorder, and left knee pain . . . ." (*Id.*). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 23-26). Thereafter, the ALJ found that Harris had the residual functional capacity ("RFC") to perform light work with the following additional limitations:

> [She] is limited to unskilled work. She can occasionally stoop, kneel, crouch or crawl. She can never climb ladders, ropes or scaffolds. She can occasionally climb ramps or stairs. She can't perform any production rate pace work. She is limited to occasional changes in a routine workplace setting. She can have occasional contact with coworkers, supervisors and the general public.

(Tr. 26). At Step Four, the ALJ found Harris "unable to perform any past relevant work." (Tr. 34). Proceeding to Step Five, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 34-35).

E.        **Administrative Record**

1.        **Medical Evidence**

The Court has reviewed Harris's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

2.        **Application Reports and Administrative Hearing**

i.        **Function Report**

On July 21, 2012, Harris filled out a Function Report. (Tr. 182-89). Before the onset of her illnesses, she noted an ability "to socialize and work and enjoy people." (Tr. 183). At the time of her writing, however, she described her condition generally as an inability to "be around a lot of people. Heart starts racing and chest hurts. Can [be] hard [to] catch my breath. And body hurts from head to toe. Want to be by myself sitting in a dark room." (Tr. 182). In a typical day, she would "get up to go to [the] bathroom, get something to drink and take all my medicine. Wait [an] hour for [her] med[icine] to kick in so [her] body won't hurt, make bed and do dishes, then sit [and] watch TV. Or reading until bed." (Tr. 183). She lives with her boyfriend and her cat, which requires her to "make sure my cat has something to eat once a day. Try to remember to clean catbox." (*Id.*). She took medication to improve her sleep as well. (*Id.*).

Harris said that due to her condition, she dressed in "baggie clothes," bathed "only every 2 or 3 days," shaved her legs once a month, washed her hair once a week, and ate once a day. (*Id.*). To remember these tasks, she marked them on the calendar. (Tr. 184). She could prepare food, so long as it was "quick and easy." (*Id.*). She spent fifteen minutes

making her bed and doing dishes on a daily basis, though some days she would "have to force myself to do them" because of her "deep depression . . . ." (*Id.*).

She noted that although she could drive and leave her home alone, she would go grocery shopping "when the store opens in the morning before people go in," and even then, only once a month for fifteen minutes. (Tr. 185). She also indicated an inability to "handle money." (*Id.*). This emerged, she suggested, from a fear "of what can happen if you don't do [it] right." (Tr. 186). Despite enjoying baking and fishing, she no longer had the "heart to bake anymore" due to her condition. (*Id.*). Her only social activities involved her biweekly doctor's appointments. (*Id.*). She noted many "times when I don't want to see or talk to anyone," which was starkly different from her previous social life of "meeting people" and "going out [to] parties." (Tr. 187).

Providing information about her abilities, she marked problems with lifting, squatting, bending, standing, walking, kneeling, talking, stair climbing, memory, concentration, understanding, and getting along with others. (*Id.*). She could walk "less than [half a] mile" before needing to stop and rest for "quite awhile." (*Id.*). Her ability to follow instructions "depend[ed] on the mood" she was in, though she also mentioned a capacity to pay attention for one to two hours at a time. (*Id.*). She indicated that she could not "handle changes" or "stress at all," cried "all the time," and felt "like someone [was] watching me." (Tr. 188). To treat her condition, she took Cymbalta, but side effects included "a lot of sweating." (Tr. 189).

Harris filed a second Function Report, dated August 7, 2013, that remained mostly consistent with her first, though showed improvement in certain respects. For instance, she

indicated an ability to do laundry, dishes, and "some mowing." (Tr. 220). She also shopped more frequently, and proclaimed an increased competence with managing money. (Tr. 221).

Ms. Nancy Arnold, Harris's friend, also filled out a third party Function Report on July 21, 2012. (Tr. 171-78). She noted that she visited Harris "off and on all day." (Tr. 171). In every respect, it is consistent with Harris's Function Report.

### ii.        Harris's Testimony at the Administrative Hearing

Harris indicated that she proceeded in school through the ninth grade before attaining her GED. (Tr. 45). She had two children, aged twenty-four and twenty-two. (*Id.*). She lived with her boyfriend, "a truck driver," and lived with him in a house "whenever he's in." (*Id.*). She last worked for pay about "four, four and a half years" before, in 2010, at J.C. Penny. (Tr. 46).  At that job, she frequently interacted with "the public" and was required to lift "about 50 pounds." (*Id.*). When she stopped working, "I started getting sick, and then I just couldn't – I would cry, and then I just started staying in." (Tr. 47). She began missing two to three days a week. (*Id.*). Before working at J.C. Penny, she worked for "Chocolates Galore in Frankenmuth" for a year and was laid off "when the economy slowed down." (Tr. 47-48).

In describing her condition, she noted, "I get nervous in crowds. I start having – if I don't take my medicine, I have chest pains. I hyperventilate. I get real anxious, to where I feel like I'm about ready to cry, so I end up going off in my own little . . . world. I'll disconnect with the people, and I'll stand off to myself. When I'm at home, there is some days that I sleep all day. I don't want to get up. I don't want to face what is ahead. There

is days I will cry. There is some days that I wished I would die." (Tr. 48-49). Physical symptoms accompanied these mental symptoms. "I'm 40-something years old . . . and I walk like I'm 80." (Tr. 49). For her general back pain, she took "Lortabs," as well as "a bunch" of other medication for her other conditions. (Tr. 50-51). Her left leg and knee also continued to swell and throb since she had "laparoscopic surgery on it" in 2000. (Tr. 51). "When my left knee buckles, I will fall." (Tr. 52). And in the February before the hearing, Harris also "had a kidney removed" due to "an untreatable kidney cancer." (*Id.*).

Asked about her abilities, Harris indicated an ability to stand for about thirty minutes before "my back will start hurting." (Tr. 54). She could sit for a while "as long as I don't sit in one spot too long." (*Id.*). Although she usually had no problems getting out of bed in the morning, "some days when the depression sets in, I stay in pajamas. And there are some days I won't even get out of bed." (*Id.*). She began experiencing problems with depression after her parents died over twenty years before, and began taking medication in 2012 when she started "having chest pains, . . ." (*Id.*). And she experienced similar issues with household chores, noting times that she would "let the dishes and stuff go. . . . because I don't want to deal with it, and with just me there, you know, I don't have to do them every day." (Tr. 55-56). She remained able to drive a car, but would "get real nervous, so I try not to drive too far." (Tr. 56). She went to the grocery store early in the morning or late at night because "I get nervous around crowds. I'll start sweating, and I'll have chest pains, and I'll have a hard time breathing, like I'm going to pass out." (*Id.*). Though she thought this chest pain was anxiety related, it was "never diagnosed as that." (Tr. 63).

9

In describing her typical day, Harris said, "I stay inside. I do go out and walk around in my yard a little bit. I sit inside. If – I try to knit, but a lot of times I don't because of my mind. So a lot of times I'll just sit there and watch TV." (Tr. 57). "I don't do social activities" because "I don't like getting in crowds." (Tr. 58). On occasion, she heard the voices of her parents, and sought counseling from a therapist on a biweekly basis. (*Id.*). She found therapy helpful "[s]ometimes . . . ." (Tr. 59). "I forget things. . . . I feel it's normal. I lose days." (Tr. 60). She also struggled with concentration and following instructions. (*Id.*). "I don't have any [energy]." (Tr. 63). Harris then described issues with other people. "I don't get along with people very well." (Tr. 61). "I'm not very close to my family members. The only one I'm really close to right now is my boyfriend." (*Id.*). "I don't ever invite nobody over." (Tr. 63). An ideal job, she indicated, would involve working alone. (Tr. 62).

### iii.        The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of the VE to determine Harris's ability to work. (Tr. 66). The VE described Harris's past jobs as "retail clerk, . . . semiskilled" and "light per the *DOT*," but "medium for the claimant," while the chocolate job was a "retail manager" position, "skilled," "light per the *DOT*," but "heavy per the claimant." (*Id.*).

In the ALJ's first hypothetical, he asked about an individual able to "perform light work which is unskilled; can occasionally stoop, kneel, crouch, or crawl; can never climb ladders, ropes, or scaffolds; can occasionally climb ramps or stairs; no production-rate pace work; occasional changes in the routine workplace setting; occasional contact with coworkers, supervisors, and the general public." (Tr. 67). The VE indicated that such an

10

individual could not work Harris's prior jobs, but other jobs remained available, including an "office cleaner"—with 3,000 job availabilities in Michigan and over 100,000 national job availabilities—an "assembler"—with 3,000 job availabilities in Michigan and 90,000 national job availabilities—and a "packager"—with 2,000 job availabilities in Michigan and over 60,000 national job availabilities. (*Id.*).

In the second hypothetical, the ALJ asked about the same hypothetical individual, except the individual is also "likely to be off-task 20 percent of the work period." (Tr. 68). The VE noted that such a limitation would be "work preclusive." (*Id.*).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both   "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical

11

sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July

12

2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling

13

reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

    (i)    [D]aily activities;

   (ii)    The location, duration, frequency, and intensity of . . . pain;
   (iii)   Precipitating and aggravating factors;
   (iv)    The type, dosage, effectiveness, and side effects of any medication .
           . . taken to alleviate . . . pain or other symptoms;
   (v)     Treatment, other than medication, . . . received for relief of . . . pain;
   (vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027,

1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore,

the claimant's work history and the consistency of his or her subjective statements are also

relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

   The claimant must provide evidence establishing her RFC. The statute lays the

groundwork for this, stating, "An individual shall not be considered to be under a disability

unless he [or she] furnishes such medical and other evidence of the existence thereof as the

Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5.

The RFC "is the most he [or she] can still do despite his [or her] limitations," and is

measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

A hypothetical question to the VE is valid if it includes all credible limitations developed

prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.

1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D.

Mich. Dec. 9, 2009).

   **G.    Analysis**

   In her brief, Harris presents two prime arguments: (1) that the ALJ performed an

improper credibility analysis, and (2) that the ALJ did not accurately evaluate her medical

source opinions. I evaluate each in turn.

### 1.      Credibility Analysis

Harris first takes issue with the ALJ's finding that her statements as to the severity of her symptoms lacked credibility. She notes that her Function Reports—which identified chest pain triggered by anxiety, a "fear of being around people," a lack of social activity other than her doctor or therapist appointments, a "deep depression" requiring her to "force herself to do housework," and an impaired "ability to care for her personal needs"— remained "consistent with her testimony." (Doc. 21 at ID 920). Thereafter, she contends that the medical record "shows that her mental health issues cause her physical symptoms," pointing out complaints of chest pain in August and September of 2011, December of 2012, and January of 2013. (*Id.*). "If there was no physical reason for these symptoms," Harris suggests, "it is more probable than not that her symptoms were caused by anxiety, which is consistent with her function reports, her testimony, and the medical opinions" submitted. (*Id.*).

In evaluating a claimant's credibility where such claimant's symptoms "suggest a greater severity of impairment than can be shown by objective medical evidence alone," an ALJ must consider (alongside other types of evidence) the claimant's "statements about the intensity, persistence, and limiting effects" of her symptoms, and whether "there are any inconsistencies in the evidence . . . ." 20 C.F.R. § 1529(c)(4). The claimant's symptoms, "including pain, will be determined to diminish [her] capacity for basic work activities to the extent that [her] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* "The claimant's credibility [regarding the

16

intensity and persistence of symptoms] may be properly discounted to a certain degree . . . where an [ALJ] finds contradictions among the medical reports, claimant's testimony, and other evidence." *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 532 (6th Cir. 2014) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004)).

The ALJ in this case provided numerous reasons for discounting Harris's credibility. He noted, for instance, that Harris did not receive "any inpatient treatment admissions (full or partial)" or "emergency room visits, beyond some individual counseling," and that her condition appeared "well controlled with prescription medications and some outpatient therapy." (Tr. 33). Evidence showed that Harris stopped working for reasons unrelated to her mental or physical impairments. (*Id.*); (Tr. 153-54) (showing that Harris's earnings stopped several years before her alleged onset date). The side effects allegedly attributable to Harris's medication presented as mild, and did not appear to "render[] her incapable of performing work-related activities." (*Id.*); (Tr. 283) (noting that medication helped Harris sleep); (Tr. 284) ("She is able to be off Xanax and she denied feeling anxious."); (Tr. 344) ("She is able to sleep because of the medication she currently takes."). Moreover, the September 2012 consultative examination of Harris by Dr. Menendes, finding that her symptoms "will interfere with her ability to perform any job duty," (Tr. 347), relied on information markedly different from that provided in Harris's testimony and the remainder of the medical record—namely, that Harris had no friends, entertained suicidal ideations, and could not prepare meals. (Tr. 29). *Compare, e.g.*, (Tr. 344-45), *with* (Tr. 171-78) (Function Report written by Harris's friend); (Tr. 280) (denying suicidal ideation).

Reliance on these inconsistencies proved entirely proper, and the ALJ's credibility determination should not be disturbed by this Court.

Nevertheless, Harris urges this Court to find that her anxiety caused her chest pains, resulting in hospital visits. As the ALJ noted, however, no doctor rendered such a diagnosis. The record contains only a passable reference to the possibility of anxiety-induced chest pain, (Tr. 255), and her therapist recognized only that Harris "report[ed] chest pains due to anxiety . . . ." (Tr. 274). Such evidence does not, as Harris posits, compel a finding that her anxiety *must* have caused these visits. Indeed, Harris bore the burden of proving that anxiety fueled her chest pain. *Accord Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) ("[T]he burden of proof lies with the claimant at steps one through four of the process, culminating with a claimant's proof that she cannot perform her past relevant work. . . . [I]t is not unfair to require a claimant to prove the extent of his impairments."); *cf. Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) ("If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.").

For these reasons, Harris's challenge to the ALJ's credibility determination should not prevail.

## 2.        Medical Source Evaluation

In Harris's second objection to the ALJ's decision, she cites error under 20 C.F.R. § 404.1527, the treating source rule, for granting "all the medical professionals who actually examined" Harris only "little or some weight," in spite of the "similar GAF scores" from each examining physician indicating "serious symptoms" over the course of "several

months . . . ." (Doc. 21 at ID 920-21). Additionally, Harris suggests that the ALJ distorted the medical record in suggesting that "none of the medical professionals believed that any of [Harris's] current complaints are significant enough to render her disabled or warranted the imposition of any exertional or nonexertional work-restrictions"—rather, she cites a statement from Dr. Menendes finding "her symptoms of depression and anxiety will interfere with her ability to perform any job duty," and that "she does not handle frustrating situations well and should not be expected to be able to cope with the stress or difficult situations in the workplace." (Doc. 21 at ID 921) (internal citations and quotation marks omitted).

Evaluating medical source statements requires considering factors such as the nature of the source's examining relationship with the client, 20 C.F.R. § 404.1527(c)(1), the source's treatment relationship with the client, *id.* § (c)(2), the supportability of the source's opinion, *id.* § (c)(3), the consistency of the opinion with the record as a whole, *id.* § (c)(4), whether the source is a specialist opining on areas within her specialty, *id.* § (c)(5), as well as "any factors" the claimant or others "bring to [the Commissioner's] attention, or of which [the Commissioner] is aware, which tend to support or contradict the opinion," *id* § (c)(6). In weighing a treating source statement, the ALJ considers the length of the treatment relationship and frequency of examination, as well as the nature and extent of the treatment relationship. *Id.* § (c)(2)(i)-(ii). Where a treating source's opinion proves "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it

"controlling weight." *Id.* § (c)(2). In any case, the Commissioner "will always give good reasons. . . for the weight we give [a] treating source's opinion." *Id.*

Aside from several GAF scores, the record contains few medical source statements. Harris's correctly observes that Dr. Menendes—and Dr. Pruitt, for that matter[1]—penned observations that might preclude employment if taken as reliable. *See generally* (Tr. 344-47); (Tr. 566-71). But neither is a treating source: Dr. Menendes saw Harris but once, which "a plethora of decisions unanimously hold" insufficient to form "an ongoing treatment relationship." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006). Similarly, Dr. Pruitt is a counselor, and thus not an "acceptable medical source"—as such, he cannot qualify as a treating source either. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). More importantly, the ALJ reasonably discarded both opinions. The ALJ reasoned, for instance, that Harris reported more severe symptoms to Dr. Menendes than she did in either Function Report, and that these inconsistencies—coupled with an "unremarkable" mental status examination—detracted from Dr. Menendes's "probative and persuasive value." (Tr. 29); (Tr. 344-47) (diagnosing a GAF score of 42 despite an ability "to function independently" and an entirely normal mental examination). Likewise, the ALJ noted that Dr. Pruitt had "only seen [Harris] a few times," and found his findings both internally inconsistent and out of sync "with the longitudinal findings from Dr. Movva or [Harris's] other counselors, nearly all of whom report that the claimant is progressing well." (Tr. 32); *e.g.*, (Tr. 284) (Dr. Movva: "[Harris] stated that her depression is a little

---

[1] Although Harris does not expressly make the argument that the ALJ should have granted more weight to Dr. Pruitt's opinion, I include it in my discussion in the interest of thoroughness.

better."). That Dr. Pruitt rendered an "extreme" assessment, yet remained "unable to answer several questions on the form," reasonably suggested a lack of credibility. (*Id.*). It is with these facts in mind that the ALJ found "that none of the medical professionals believed that any of the claimant's current complaints are significant enough to render her disabled or warranted the imposition of any exertional or nonexertional work restrictions." (Tr. 32). The ALJ merely affirmed that no *reliable* medical opinions produced findings that would preclude work. And his opinion leaves little doubt that he thoughtfully considered all medical opinions and rested this conclusion on substantial evidence.

In rebuttal, Harris might gesture toward several uniformly low GAF scores that the ALJ allegedly weighed improperly. Challenges to an ALJ's GAF score analysis typically wage an uphill battle, for though GAF scores "may help an ALJ assess mental RFC," they are "not raw medical data." *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007). Where an ALJ "had reason to doubt the credibility of the assigning source; the claimant had conflicting GAF scores; the GAF scores were not accompanied by a suggestion that the claimant could not perform any work; substantial evidence supported the conclusion that the claimant was not disabled; and the VE testified that an individual with the claimant's limitations could still perform a number of jobs," the Sixth Circuit generally refuses to find that a low GAF score undermined the ALJ's reasoning. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836 (6th Cir. 2016). If, however, the Court finds "consistency among low GAF scores," such finding may show that an ALJ "minimized the severity of a claimant's symptoms and failed to provide good reasons for assigning limited weight to a treating doctor's opinion." *Id.*

Harris's GAF scores are as follows: (i) 45, as diagnosed in January 2012 by Ms. Deb Geno; (ii) 45-50, as diagnosed in March 2012 by Dr. Movva; (iii) 42, as diagnosed in September 2012 by Dr. Menendes; (iv) 45-50, as diagnosed in January 2013 by Ms. Katherine Partlow; and (v) 31, as diagnosed in August 2013 by Dr. Pruitt. The ALJ discussed each score at some length in his decision. Harris's GAF score of 31, for instance, fell far outside the scope of all her other GAF scores, which made it unreliable. (Tr. 32); (Tr. 566). In discussing the score Ms. Partlow assigned, the ALJ noted that it coincided with several stressors "preventing an improvement in the claimant's score." (Tr. 31); (Tr. 429) (documenting how Harris's chest pains began "after an argument with her daughter."). He added that Harris's unchanged "treatment regimen" suggested that her conditions were stable on medication. (Tr. 31); (Tr. 429) ("[Harris] feels that her medications are working well and is happy with the medications currently."). That Dr. Movva co-signed the score, likewise, deserved little weight as signaling "approval as to form rather than content." (Tr. 31); (Tr. 429-30); *cf. Engebrecht v. Comm'r of Soc. Sec.*, 572 F. App'x 392, 398 (6th Cir. 2014) (finding co-signing an opinion insufficient to adopt an opinion). Similarly, Ms. Geno's assigned score aligned with situational stressors such as "lack of employment" and otherwise clashed with Ms. Geno's "mostly mild findings, including a mostly normal mental status examination." (Tr. 30); (Tr. 279-81). Although Dr. Movva later became Harris's treating psychiatrist, his score emerged at Harris's "initial evaluation" before a treating relationship had formed, depriving it of much significance. (Tr. 31); (Tr. 283). And Dr. Menendes's score, like her opinion, rested on skewed information and remained unsupported "by the relatively mild findings in [her] report . . . ." (Tr. 31). Having

thoroughly explained why each ranking deserved only some or little weight, there appears no trace of improper neglect or weighing as to Harris's GAF scores.

Moreover, substantial record evidence buttresses the ALJ's RFC analysis. The ALJ accommodated Harris's documented social problems, for instance, in limiting her to only "occasional contact with coworkers, supervisors and the general public." (Tr. 26). This finding was justified—record evidence showed that, despite Harris's general reticence, she had friends and a boyfriend, indicating at least a narrow tolerance for interpersonal interaction. *E.g.*, (Tr. 171-78) (demonstrating Harris had a friend). In accordance with Harris's and Ms. Arnold's testimony alleging concentration difficulties and an inability to handle stress, the ALJ restricted Harris to non-production rate pace work and "occasional changes in a routine workplace setting." (Tr. 26); (Tr. 177) (noting that Harris did not handle changes in routine well); (Tr. 283) (documenting that Seroquel had helped Harris sleep). Record evidence did not require more severe accommodations. For these reasons, Harris can trace no error in the ALJ's reasoning and I suggest that the ALJ's findings are supported by substantial evidence.

### H.      Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Harris's Motion for Summary Judgment, (Doc. 21), be **DENIED**, the Commissioner's Motion, (Doc. 24), be **GRANTED**, and that this case be **AFFIRMED**.

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and

file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 20, 2017                                  S/ PATRICIA T. MORRIS
                                                         Patricia T. Morris
                                                         United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 20, 2017                    By s/Kristen Castaneda
                                          Case Manager